UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| REGINALD VANCE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 18-cv-00577 (APM) |
| PETER O'ROURKE[1] | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This matter comes before the court on Plaintiff Reginald Vance's single-count complaint, which alleges a hostile work environment on the basis of race. Presently before the court is Defendant's Motion for Judgment on the Pleadings or, in the alternative, Motion for Summary Judgment. For the reasons that follow, the court grants Defendant's Motion in part and denies it in part.

**II.  BACKGROUND**

**A.  Factual Background**

Plaintiff Reginald Vance is an African American male, Compl., ECF No. 1 [hereinafter Compl.], ¶ 4, employed by the U.S. Department of Veterans Affairs ("VA"). From July 2013 to January 9, 2017, Plaintiff held the position of Supervisory Program Supervisor in the VA's Veteran Affairs Learning University ("VALU"). Def.'s Mot. for J. on the Pleadings or, in the Alternative, for Summ. J., ECF No. 12 [hereinafter Def.'s Mot.], Def.'s Stmt. of Material Facts Not in Genuine

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substituted the current Acting Secretary of the U.S. Department of Veterans Affairs, Peter O'Rourke.

Dispute, ECF No. 12-1 [hereinafter Def.'s Stmt.], ¶¶ 1–2; Pl.'s Mem. of P&A in Opp'n to Def.'s Mot., ECF No. 14 [hereinafter Pl.'s Opp'n], Pl.'s Stmt. of Disputed Material Facts, ECF No. 14-5 [hereinafter Pl.'s Stmt.], at 1 (not disputing Def.'s Stmt. ¶¶ 1–2). During this period, Plaintiff's second-line supervisor was the Dean of VALU, George Tanner, a Caucasian male. Def.'s Stmt. ¶ 2; Pl.'s Stmt. at 1 (not disputing Def.'s Stmt. ¶ 2). Plaintiff's first-line supervisor was Mary Holland, a Caucasian female. Def.'s Stmt. ¶ 3; Pl.'s Stmt. at 1 (not disputing Def.'s Stmt. ¶ 3). On or about January 9, 2017, the VA disbanded VALU and realigned its programs and services to other organizations within the agency. *See* Def.'s Stmt. ¶ 5; Pl.'s Stmt. at 1 (not disputing Def.'s Stmt. ¶ 5). Due to this reorganization, Plaintiff was reassigned to the position of Director, Learning Infrastructure, Office of Enterprise Support Services. *See id.*

In December 2016 or January 2017—there is some dispute as to the precise date[2]—Tanner created a farewell video for a departing employee, Amber Blake ("Blake Video"). Def.'s Stmt. ¶¶ 6, 8; Pl.'s Stmt. (not disputing Tanner participated in Blake Video). The video's contents are not in dispute. Tanner is seated alone behind a small table, on which sits four statuettes of monkeys. Def.'s Mot., Ex. 8, ECF No. 12-5. One monkey has its hands covering its eyes; another its ears; and the third its mouth. *See id.* The fourth monkey has its hands by its side. *See id.* In front of the statuettes sits an approximately two-foot-long, two-inch-high sign that reads: "You Don't Have To Be Crazy To Work Here . . . We'll Train You." *See id.* During the 26-second long video, Tanner states as follows:

> Hi Amber. Several members of the senior staff and I have gathered here today to wish you a fond farewell. Of course you can see some

---
[2] The parties' submissions, including the Complaint, generally fix December 2016 as the relevant period. *See* Compl. ¶ 9; Def.'s Mot., Ex. 6, Decl. of George Tanner, ECF No. 12-4, at 28-29; Def.'s Mot., Ex. 5, Aff. of Reginald Vance, ECF No. 12-4 [hereinafter Vance Aff.] at 22; Pl.'s Opp'n, Ex. A, Aff. of Deidre Wallace, ECF No. 14-1 [hereinafter Wallace Aff.], at 3. One document, however, identifies January 2017 as the month during which Tanner made the video. *See* Def.'s Mot., Ex. 13, ECF No. 12-5 [hereinafter Suspension Notice], at 29. Defendant now contends that this document's reference to January 2017 was a "scrivener's error." *See* Def.'s Reply, ECF No. 18, Decl. of Cynthia Moore, ECF No. 18-1, ¶ 3.

> of the Directors here, I won't name them, you can figure out which ones are which. We want to wish you the very best in your new job. Um, you are a person that we'll miss here. You've done a lot of great work in the communications area but I look forward to hearing great things about you in your new position.

Def.'s Stmt. ¶ 8; Pl.'s Stmt (not disputing statement). According to Tanner, the four monkey statuettes represented "see no evil," "hear no evil," "speak no evil," and "do no evil," and he meant no offense by alluding to the "Directors" as monkeys. *See* Def.'s Mot., Ex. 6, Decl. of George Tanner, ECF No. 12-4, at 29.[3] There is a dispute of fact as to whether all four Directors serving under Tanner were in fact African Americans. *See* Def.'s Stmt. ¶ 4 (two African Americans, two Caucasians); Pl.'s Stmt. ¶ 4 (four African Americans).

Plaintiff was not present at Blake's farewell party, so he did not see the video when it was first shown. But he claims that the Blake Video became "viral" and "received numerous views." Pl.'s Opp'n at 4; *See* Pl.'s Opp'n, Ex. B, ECF No. 14-2 [hereinafter Perry Aff.], at 7. According to his Complaint, Plaintiff first saw the video on February 10, 2017, when a colleague, Deirdre Wallace, showed it to him. *See* Compl. ¶ 10. In a prior statement, however, Plaintiff represented that he first viewed the video in December 2016. *See* Def.'s Mot., Ex. 5, Aff. of Reginald Vance, ECF No. 12-4 [hereinafter Vance Aff.] at 23. For reasons discussed below, the date on which Plaintiff first viewed the Blake Video is a critical factual dispute.

### B. Plaintiff's EEO Contact

Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor on February 27, 2017. Def.'s Stmt. ¶ 16; Def.'s Mot., Ex. 1, ECF No. 12-4 [hereinafter EEO Counselor Report] at 2. Following that contact, an EEO counselor met with Plaintiff for an informal counseling session. *See* Def.'s Stmt. ¶ 18; EEO Counselor Report at 2. Thereafter, on March 30, 2017,

---

[3] The court uses ECF pagination when referencing exhibits.

Plaintiff was notified of his right to file a formal EEO complaint. *See* Def.'s Stmt. ¶ 19; Def.'s Mot., Ex. 2, ECF No. 12-4 [hereinafter Right to File Letter], at 6.

Plaintiff filed his formal EEO complaint with the Agency's EEO office on April 11, 2017, making two allegations. Def.'s Mot., Ex. 3, ECF No. 12-4 [hereinafter EEO Compl.]; Def.'s Stmt. ¶ 20; Pl.'s Stmt (not disputing statement). First, Plaintiff asserted that Tanner made false statements regarding Plaintiff's position being susceptible to a reduction in force. Second, he claimed that Tanner acted with racial animus when making the Blake Video. Plaintiff maintained that, taken together, these events created a hostile work environment. Def.'s Stmt. ¶ 20; EEO Compl. at 11. The agency's EEO Office accepted for investigation Plaintiff's claim concerning the Blake Video, but not his contention that Tanner had informed him that he might be subject to a reduction in force. Def.'s Stmt. ¶ 21; Def.'s Mot., Ex. 4, ECF No. 12-4 [hereinafter Partial Acceptance Letter], at 16–17; *see also* Def.'s Mot., Ex. 12, ECF No. 12-5 [hereinafter Appointment Letter], at 26. The EEO Office explained that it was dismissing the former claim because Plaintiff was not, in fact, subject to a reduction in force, and merely being informed of such possibility was not an adverse action. *See* Def.'s Stmt. ¶ 22; Pl.'s Stmt. (not disputing fact).

On December 14, 2017, the Agency's Office of Employment Discrimination Complaint Adjudication ("OEDCA") issued a final decision. Def.'s Stmt. ¶ 31; Def.'s Mot., Ex. 9, ECF No. 12-5, at 5–17. The OEDCA affirmed the dismissal of Plaintiff's contention regarding the threatened reduction in force. *See id.* at 7–8. As to Tanner's use of the monkey statuettes in the Blake Video, the OEDCA found that, although Tanner's conduct was "inappropriate, racially insensitive and perceived as racially derogatory," Plaintiff had not offered "sufficient evidence . . . to establish that [Tanner's] remark in conjunction with the use of the monkey statuettes was motivated by race in violation of Title VII." *Id.* at 15.

C.  **Procedural History**

Plaintiff filed suit in this District on March 14, 2018, asserting a single count of hostile work environment in violation of Title VII of the Civil Rights Act of 1964. *See* Compl. ¶¶ 12–18. Plaintiff's claim is more expansive than that originally presented to the agency. Plaintiff now alleges that from 2013 to 2017, Tanner "often" harassed Plaintiff in his position as his second-line supervisor. *Id.* ¶ 8. Plaintiff identifies a host of behaviors, discussed in further detail below, that he claims comprise the alleged hostile work environment. *Id.*

Shortly after filing its Answer, *see* Def.'s Answer, ECF No. 8, and instead of proceeding to discovery, Defendant requested leave to file a pre-discovery dispositive motion, *see* Meet and Confer Statement, ECF No. 10, at 3, which the court permitted, *see* Order, July 26, 2018. Consequently, neither party has taken discovery in advance of this motion.

## III.   LEGAL STANDARD

Although Defendant moves in the alternative for judgment on the pleadings or for summary judgment, the court treats Defendant's motion as one for summary judgment, as Defendant relies on "matters outside the pleadings." Fed. R. Civ. P. 12(d). A court shall grant a summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To make this determination, the court must "view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations and internal quotation marks omitted). The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Rather, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it can affect the outcome of litigation.  *Anderson*, 477 U.S. at 248.  If the court determines "no reasonable jury could reach a verdict in [non-movant's] favor," then summary judgment is appropriate.  *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).

IV.  **ANALYSIS**

Defendant advances two arguments for entry of judgment in its favor.  First, Defendant asserts that Plaintiff's hostile work environment claim is barred because Plaintiff failed to exhaust administrative remedies.  Def.'s Mot., Def.'s Mem. in Support of Mot., ECF No. 12-2 [hereinafter Def.'s Mem.], at 6–8.  Second, Defendant contends that Plaintiff's allegations, even if true, do not make out a hostile work environment claim as a matter of law.  *Id.* at 8–17.  For his part, Plaintiff opposes these two arguments, *see* Pl.'s Opp'n at 8–16, but also asks the court to defer ruling on summary judgment until he has had the opportunity to take discovery, *see id.* at 6–8.

The court first considers Defendant's argument that Plaintiff failed to exhaust administrative remedies prior to filing this suit, before turning to the merits and Plaintiff's demand to take discovery.

A.  **Timely Exhaustion of Administrative Remedies**

"Before filing suit, a federal employee who believes that her agency has discriminated against her in violation of Title VII must first seek administrative adjudication of her claim." *Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010).  As a first step, "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action" in an effort to informally resolve the matter.  29 C.F.R. § 1614.105(a)(1).  If this process is

6

unsuccessful, the counselor must inform the employee of his right to file a discrimination complaint with the agency's EEO office. *Id.* § 1614.105(d). An employee must file the EEO complaint within 15 days after receiving notice of his right to do so. *See id.* § 1614.106(b). After a formal investigation or an administrative hearing, "[a]n employee who is aggrieved by the agency's final disposition of her complaint may then either appeal to the EEOC or file suit in federal court . . ." *Payne*, 619 F.3d at 58.

The exhaustion requirement imposes another important limitation on an employee's Title VII suit. "A Title VII lawsuit . . . is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation omitted). "At a minimum, the Title VII claims must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.* (citation omitted). This restriction in scope serves the important purpose of giving the accused party adequate notice of the claim and allowing the agency to investigate and resolve it promptly. *See id.; see also Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). A defendant bears the initial burden of "pleading and proving" untimeliness or lack of exhaustion of administrative remedies as an affirmative defense. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).

In this case, the agency contends that Plaintiff did not exhaust his administrative remedies in two ways. One, he did not timely raise his hostile work environment claim within 45 days of viewing the Blake Video. *See Al-Saffy v. Vilsack*, 827 F.3d 85, 98 (D.C. Cir. 2016) (applying 45-day time limit under the rubric of exhaustion). And, two, the scope of his hostile work environment claim in his Complaint exceeds that which he presented in his formal EEO complaint. In advancing these arguments, Defendant deconstructs Plaintiff's hostile environment claim into

7

seven constituent "Events," see Def.'s Mem. at 1–2, which allegedly occurred between July 2013 and January 2017. They are:

- Event 1: Tanner demanded that Plaintiff work while on sick leave, Compl. ¶¶ 8, 17;
- Event 2: Tanner assigned Plaintiff tasks that were not included in his job duties or responsibilities, *id.*;
- Event 3: Tanner held Plaintiff accountable for the performance of other employees, *id.*;
- Event 4: Tanner publicly interacted with Plaintiff in an unprofessional manner *id.*;
- Event 5: Tanner unnecessarily reprimanded him based on false accusations of Plaintiff's performance and tone of his emails, *id.*;
- Event 6: Tanner threatened Plaintiff's employment by falsely stating that Plaintiff and other VALU employees were susceptible to a "reduction in force" based on the positions they occupied, *id.*; and
- Event 7: Tanner referred to his African American subordinates as monkeys during the Blake Video, *id.* ¶¶ 9, 17.

In evaluating Defendant's exhaustion arguments, the court takes these events in reverse order.

1. Event 7: the Blake Video

Defendant argues that a hostile work environment claim based on the Blake Video is unexhausted because Plaintiff failed to raise it with an EEO counselor within 45 days of first viewing the video. *See* Def.'s Mem. at 7–8. It is undisputed that Plaintiff first contacted an EEO counselor on February 27, 2017, to protest the Blake Video. Def.'s Stmt. ¶ 16; EEO Counselor Report at 2; Pl.'s Stmt. (not disputing fact). Therefore, for his claim to be properly exhausted, Plaintiff had to have viewed the video for the first time on January 13, 2017, or thereafter. Defendant contends that Plaintiff first viewed the Blake Video in December 2016, pointing to his

sworn EEO Affidavit, in which Plaintiff identified the dates on which he viewed the Blake Video, the first of which is "December 2016." Vance Aff. at 23. Plaintiff asserts—but only as argument and not through affidavit—that his inclusion of a December 2016 viewing date was a mistake, and that he saw the video for the first time in February 2017. *See* Pl.'s Opp'n at 9.

If the only evidence before the court was Plaintiff's EEO Affidavit, Plaintiff's unsworn disavowal of the December 2016 date would not have sufficed to avoid summary judgment for failure to exhaust. But there is other evidence that supports a first-time viewing in February 2017. The EEO Counselor's Report from April 7, 2017, lists the "incident" date as February 10, 2017, although it also marks "No" under the column asking if the claim is timely. *See* EEO Counselor Report at 3. Additionally, the EEO "Right to File" letter that the EEO counselor sent to Plaintiff lists the "Dates of Occurrence" of Plaintiff's allegations as February 8, 2017, and February 10, 2017. Right to File Letter at 6. Then, in Plaintiff's Formal EEO Complaint, he lists the date of occurrence as February 21, 2017. EEO Compl. at 11. Finally, there is the sworn affidavit submitted by Plaintiff's co-worker at VALU, Randy Perry, during the EEO investigation, in which Perry states that he viewed the video with Plaintiff in Plaintiff's office on February 10, 2017. Perry Aff. at 3–4.

As the foregoing evidence shows, there exists a genuine dispute of material fact as to when Plaintiff first viewed the Blake Video. At this stage, the court must resolve that dispute in favor of Plaintiff. Therefore, the court cannot find that Plaintiff failed to timely exhaust his hostile work environment claim. *Cf. Al-Saffy*, 827 F.3d at 99 (finding that a genuine dispute of material fact as to when the plaintiff learned of the defendant's involvement in his removal foreclosed granting summary judgment based on failure to exhaust).

## 2. *Events 1 through 6*

Having concluded that there is a genuine factual dispute as to whether Plaintiff timely presented his hostile work environment *claim*, the question now becomes on what alleged acts may Plaintiff rely to advance his claim. According to Defendant, no other alleged acts can comprise the hostile work environment claim because Plaintiff did not adequately raise them in his EEO complaints. The court first addresses the Tanner "threat," i.e. Event 6, and then considers the first five Events together.

### a. Event 6: Tanner's Threated Reduction in Force

As to the allegation that Tanner "threatened" Plaintiff by telling him that he might be subject to a reduction in force, Defendant argues only that "nothing in Plaintiff's Formal EEO complaint . . . reflects that Plaintiff ever alleged that [Event 6] was a 'threat' or a form of harassment." Def.'s Mem. at 7. Although Plaintiff does not squarely address this argument in his opposition, *see generally* Pl.'s Opp'n, the court does not find it in any way persuasive. Plaintiff clearly identified Tanner's alleged statement that Plaintiff might be subject to a reduction in force in his formal EEO complaint. *See* EEO Compl. at 11. The fact that Plaintiff did not explicitly characterize the statement as a "threat" is not disqualifying. Indeed, courts have held that an employee need not even utter the words "hostile work environment" in an administrative complaint to preserve it for a Title VII action. *See Na'im v. Rice*, 577 F. Supp. 2d 361, 372 (D.D.C 2008) (stating that "[b]ecause the plaintiff need not specifically allege a hostile work environment claim, and because she supports her hostile environment claim with factual allegations also contained in her August 2006 formal EEO complaint, the court concludes that she has adequately exhausted administrative remedies")**.** Simply put, the law does not subject Plaintiff to the stringent exhaustion standard that Defendant demands. Accordingly, Plaintiff's failure to include the word

"threat" in his formal EEO complaint does not require excising Event 6 from Plaintiff's hostile work environment claim.

### b. Events 1 through 5: Alleged Past Harassment by Tanner

Plaintiff concedes that during the EEO process he did not raise any of the alleged harassing behavior he now attributes to Tanner in Events 1 through 5. The court agrees with Defendant that the complete failure to mention these Events renders them unexhausted.

The purpose of the exhaustion requirement is to afford the agency an opportunity to fully investigate and resolve an employee's claim. The allegations in the administrative complaint therefore must be specific enough to "give federal agencies an opportunity to handle matters internally whenever possible." *Brown*, 777 F.2d at 14. Here, Plaintiff's informal and formal EEO complaints gave the agency no notice whatsoever that Tanner had engaged in any form of harassment other than the Blake Video and the reduction-in-force episode. In fact, when asked by the EEO investigator why he had asserted that Tanner has "a history of racist behavior," Plaintiff remarked only that "Mr. Tanner has received numerous complaints from several African Americans regarding his blatant disrespect and disdain of negroes, as evidenced by his reference to negroes as monkeys in the video." Def.'s Mot., Ex. 11, ECF No. 12-5, at 23. Plaintiff thus specified no other past harassing behavior. Plaintiff therefore failed to exhaust his hostile work environment claim insofar as it relies on the alleged harassing Events 1 through 5. *See Grosdidier v. Chairman, Broadcasting Bd. of Governors*, 774 F. Supp. 2d 76, 98–99 (D.D.C. 2011) (finding that elements of a hostile work environment claim were not exhausted where the employee's administrative complaint gave the agency no notice of them).

Plaintiff attempts to avoid this conclusion by asserting that Events 1 through 5 are "related" to those aspects of his hostile work environment claim that are exhausted and therefore his failure

to raise them during the administrative process is not fatal. Pl's. Opp'n at 15. But that argument strains credulity. In the parallel context of Title VII's statute of limitations, the D.C. Circuit has held that untimely and timely discrete acts can be joined together as a single hostile environment "only if they are adequately linked into a coherent hostile environment claim—if, for example, they involve the same type of employment actions, occur relatively frequently, *and* are perpetrated by the same managers." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (internal quotation marks omitted) (emphasis added). These factors are useful guideposts for determining whether acts are "related" for exhaustion purposes. Applying those factors here, Plaintiff's hostile environment claim, as alleged, falters. First, the employment actions at issue are not of the same type. That Tanner, for example, "unreasonably reprimand[ed] him . . . regarding his performance and the tone of his emails," or "requir[ed] him to work . . . [while] on sick leave," Compl. ¶ 8, bears no logical connection to Plaintiff's main charge that Tanner created a racist video about his subordinates that was widely viewed within the office. Second, Plaintiff offers no proof that that harassing acts happened "relatively frequently." All he does is make the conclusory assertion that Tanner's actions alleged in Events 1 through 5 occurred "often." *Id.* Finally, although Plaintiff emphasizes that "Mr. Tanner serves as the common thread that tied together the discretionary actions against him," Pl.'s Opp'n at 16, Plaintiff ignores that harassing conduct by a single supervisor is only one factor the court must consider. And, here, that factor by itself cannot create the type of coherent hostile work environment that would have allowed the agency to address it internally before Plaintiff filed suit. Accordingly, the court finds that Plaintiff failed to exhaust

his hostile work environment claim to the extent it relies on Events 1 through 5.[4] As such, the court grants summary judgment in favor of Defendant with regard to Events 1 through 5.

B.     Merits of Plaintiff's Hostile Work Environment Claim

Having determined that Plaintiff's claim is not unexhausted in its entirety, the question becomes whether the events that are properly before the court—specifically, the Blake Video and the Tanner threat—are legally sufficient to support a hostile work environment claim. Plaintiff's assertion that Tanner ambiguously threatened the possibility that he could be subject to a reduction in force adds little to the analysis, so the critical inquiry is whether the Blake Video is enough on its own to make out a hostile work environment claim, at this stage. The court finds that it is.

"Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002). The D.C. Circuit's decision in *Ayissi-Etoh v. Fannie Mae* comes closest to presenting such an "extreme circumstance." There, the plaintiff argued that his team lead's "use of [the word n*gger] while yelling at [plaintiff]," his employer's "delay in subsequently separating [plaintiff] and [plaintiff's team lead] from having to work together," as well as a senior employee's "racially explicit statements to [plaintiff] about [ ] salary," constituted a hostile work environment. 712 F.3d 572, 577 (D.C. Cir. 2013). As to the team lead's use of the n-word, the court noted that "[t]his single incident might well have been sufficient to establish a hostile work environment." *Id.* The court ultimately did not have to reach that conclusion, however, because that incident together with a senior employee referring to the plaintiff as a "young black man" when denying him a raise and the months it took the employer to remove the plaintiff from the team was sufficient to make out

---

[4] Plaintiff appears to suggest that equitable tolling might save his broader hostile work environment claim. But even if applicable—and Plaintiff has offered no facts to support its relevance here—equitable tolling would do nothing to cure the fact that Events 1 through 5 are in no way related to those aspects of the claim that Plaintiff did exhaust.

a hostile work environment at the summary judgment stage. *Id.* at 576–77. Notably, in a concurring opinion, then-Judge Kavanaugh expressed the view that the team lead's directing the n–word at the plaintiff "by itself would establish a hostile work environment for purposes of federal anti-discrimination laws." *Id.* at 579 (Kavanaugh, J., concurring).

This is not the first time a court in this District has faced the question of whether the alleged use of a monkey to depict African American co-workers might, by itself, constitute a hostile work environment. In *Burkes v. Holder*, the plaintiff claimed that he "witnessed a stuffed monkey," which had been hung by his supervisor, "hanging by its neck on an eraser board in a public work area within the office." 953 F. Supp. 2d 167, 170 (D.D.C. 2013). Plaintiff's hostile work environment claim was premised solely on this incident, and Judge Sullivan found, at the motion-to-dismiss stage, that the combination of "two symbols—a monkey and a noose—g[ave] rise to a plausible inference of a hostile workplace environment as relates to plaintiff as an African-American." *Id.* at 179. The court explained: "Given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that the use of monkey imagery is intended as a racial insult where no benign explanation for the imagery appears." *Id.* (citing *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1297 (11th Cir. 2012)).

In *Toomer v. Mattis*, Judge Sullivan reached a different conclusion when a monkey-like action figure was at issue. There, the plaintiff asserted that the display of an "ape- or monkey-like creature," which had the appearance of Bigfoot, with a white cord wrapped repeatedly around its torso was by itself sufficient to create a hostile work environment. 266 F. Supp. 3d 184, 194–96 (D.D.C. 2017). Judge Sullivan disagreed. Distinguishing *Burkes*, he found, on a motion for summary judgment, that the white cord did not represent a noose—even though the plaintiff

perceived it to be one—and that there was an "undisputed benign explanation" for the monkey-like action figure—it was a reference to a white co-worker, who had the name Bigfoot because of his size and because he wore a full beard. *Id.* at 195. Based on the undisputed record, Judge Sullivan concluded that "a reasonable observer would not describe [the white cord] as a noose," and further that the defendant's position was "consistent with the office hijinks of which the action figure was a part." *Id.*

One of the key differences between *Burkes* and *Toomer* is the stage at which each decision was rendered. *Burkes* involved a motion to dismiss, whereas the court decided *Toomer* on a motion for summary judgment. Here, Defendant has been quick to move for summary judgment, leaving Plaintiff without an opportunity to take discovery concerning Tanner's making of the Blake Video. Although the summary judgment standard applies here, the court has the discretion to allow Plaintiff time to take discovery before deciding *as a matter of law* that there is "an undisputed" benign explanation for Tanner's conduct. *See* Fed. R. Civ. P. 56(d), (e). Ultimately, the court could find, as the agency concluded, that Tanner harbored no racial animus in making the Blake Video and that he used the monkey display "merely [as] a prop . . . as part of a passing introductory comment." Tanner Affidavit at 31. On the other hand, at this stage, before Plaintiff has had the chance to take discovery, it is plausible that Tanner purposefully used the monkey statuettes to refer to his African American Directors in order to draw on the ugly racial imagery of associating African Americans with monkeys. The court therefore will deny summary judgment in favor of Defendant at this time.

The court addresses two loose ends before moving on. Defendant argues that an important factor in assessing the severity of a hostile work environment is whether the harassing behavior is directed at the plaintiff, or at others. Def.'s Reply, ECF No. 18 [hereinafter Def.'s Reply], at 6

(citing *Kelley v. Billington*, 370 F. Supp. 2d 151, 159 (D.D.C. 2005) (stating that "harassment . . . directed at others . . . is considered less hostile"), and *Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) ("Conduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment.")). The court does not quibble with this principle. Rather, the record is unclear as to whether Plaintiff was one of the four Directors to whom Tanner was referring in the Blake Video. *See* Def.'s Stmt. ¶ 5 (noting that the plaintiff, as some point, held the title of "Director").[5] The court therefore makes no finding, at this juncture, on whether Tanner directed the video at employees other than Plaintiff.

Second, Defendant asserts that the agency took appropriate action following the Blake Video and, therefore, under *Vance v. Ball* it cannot be held liable, even if the Blake Video created a hostile work environment. Def.'s Mem. at 11–12. The Supreme Court in *Vance* held that, in cases like this one, where "no tangible employment action is taken, the employer may escape liability [for a supervisor's action] by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." 570 U.S. 421, 424 (2013). Here, whether the agency's response to the Blake Video was "reasonable" raises a fact question that cannot be decided without discovery. Furthermore, on the present record, it would appear that Plaintiff *did* take advantage of "preventative or corrective" opportunities by invoking the EEO complaint procedure after viewing the Blake Video. Accordingly, factual disputes foreclose granting Defendant summary judgment on its affirmative defense.

---

[5] The organization chart that Defendant attaches to attempt to establish that the Directors, at the time of the Blake Video, were not all African Americans lacks clarity. The chart is nearly illegible, and it is uncertain where Plaintiff falls in the chain of command. Def.'s Mot., Ex. 17, ECF No. 12-4, at 37.

### C. Plaintiff's Request for Discovery

As indicated, the court will permit Plaintiff to take discovery on his hostile work environment claim. Defendant, however, challenges the court's authority to chart that course, asserting that Plaintiff's Rule 56(d) affidavit falls short of the requirements set forth in *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). *See* Def.'s Reply at 1–2. *Convertino* provides that a Rule 56(d) declaration must "state[ ] with sufficient particularity why additional discovery is necessary." *Convertino*, 684 F.3d at 99. The declaration must satisfy the following three criteria: "(1) [I]t must outline the particular facts [the non-movant] intends to discover and describe why those facts are necessary to the litigation; (2) it must explain why [the non-movant] could not produce the facts in opposition to the motion for summary judgment; and (3) it must show the information is in fact discoverable." *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014) (internal quotation marks and citation omitted).

In this case, the Rule 56(d) affidavit—prepared by Plaintiff's counsel—could do more to set forth the "particular facts" sought in discovery, but in the end the court is satisfied that the affidavit meets the *Convertino* requirements. Plaintiff seeks evidence of "discriminatory animus" by Tanner. Pl.'s Opp'n, Declaration of David A. Branch, ECF No. 14-6, at 1. Although the affidavit focuses on the need for documents as proof, presumably Plaintiff would like the opportunity to depose Tanner as well. Such basic discovery is appropriate before the court considers granting judgment in favor of Defendant. *See Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) ("The court has long recognized that a party opposing summary judgment needs a reasonable opportunity to complete discovery before responding to a summary judgment motion and that insufficient time or opportunity to engage in discovery is cause to defer decision on the motion." (internal quotation marks omitted)).

## V. CONCLUSION

For the reasons stated above, the court grants Defendant's Motion for Summary Judgment in part and denies it in part.

Dated: February 22, 2019

Amit P. Mehta
United States District Judge